HARDY, Judge.
This is a compensation suit in which plaintiff claims permanent and total disability. After trial there was judgment in favor of the plaintiff and against the defendant employer and his insurer, awarding compensation at the rate of $24.70 per week for the period of disability, not exceeding 400 weeks, from which judgment defendants have appealed.
Plaintiff alleged that on or about November 28, 1950, while employed by defendant, Brezner, a general contractor doing construction work in and on the city water plant in Monroe, Louisiana, and while operating a big air hammer he sustained an accident which caused injuries resulting in permanent and total disability.
There is no dispute as to plaintiff’s employment, wages, nor the occurrence of the accident. The facts show that while in the course of operating the air hammer, connected with a hose carrying approximately 800 pounds pressure, the bolt by which the hose was affixed to the head of the instrument pulled-loose and the end of the hose struck plaintiff a violent blow on the top of the head, knocking him to the ground and, allegedly, rendering him temporarily unconscious. Plaintiff’s allegations of injury specify dizziness, pain in the head, soreness in the neck, bleeding from the nose and ears, limitation of ability to use his back and shoulders, impairment of his eyes, affection of his ears, and, generally, subsisting injury to the ligaments, nerves, muscles and bony structures of 'his head, neck and body.
Following the accident plaintiff was hospitalized for a period of some thirteen days after which he was returned to his home. He remained under medical care until April 5, 1951 when he was finally discharged by his attending physician. Compensation was paid for thirteen weeks at $24.70 per week, together with medical expenses in the total sum of $457.11.
We are here confronted with the necessity for the determination of a purely factual question of disability, which is, as usual, attended by a violent conflict of medical testimony. Unfortunately, we find it necessary to burden this opinion with a somewhat detailed and comprehensive analysis of the testimony of the witnesses which has ¡material bearing upon the solution of the proposition.
By way of general observation it is noted that plaintiff is a Negro man who was 62 years of age at the time of the accident and who had been engaged in manual labor throughout his lifetime. With one exception the record fails to disclose any objective symptoms of disability. This exception is found in the testimony of one of plaintiff’s medical experts who asserted that he found on examination of plaintiff a slight thickening of the scalp which he thought possibly indicated a low-grade os-teomyelitis.
Immediately following the accident a physical examination of plaintiff disclosed a small cut which was described by the attending physician as being “more of a brush burn than a laceration, which means that it did not extend through the true skin” on the left side of the head in the parietal area. Although plaintiff was unquestionably knocked down by the force of the blow, there is no real evidence that he was rendered unconscious. Unquestionably he was temporarily dazed. There was no bleeding except from the cut described, nor did plaintiff suffer from nausea nor from any loss of motion or function. The careful examination made immediately following the accident disclosed that the ear drums were not ruptured; there was no blood or spinal fluid in the ear canal, and heart and blood pressure were normal. According to the testimony of the attending physician plaintiff was placed in the hospital purely as a precautionary measure'in conformity with the good medical practice of requiring a period of observation following the history of any head injury. X-ray plates of the cervical spine disclosed an arthritic condition and a slight narrowing of-the intervertebral space between the fourth and fifth vertebrae, both of which conditions, according to the vast preponderance of the medical testimony, were of long standing and bore no relation to the injury.
*133 Plaintiff offered the testimony of four medical experts and the testimony of two of these witnesses may be briefly discussed and eliminated as haying no vital bearing upon the question at issue. Dr. Madison W. Foster testified that he was called to attend plaintiff in November of 1951, at which time plaintiff was complaining of his head and gave a history of having “fallen out” a few minutes prior to the doctor’s arrival. Aside from checking his blood pressure, which was found to be normal, this witness administered no treatment and made no further examination. Plis services were restricted to sending the patient to the Charity Hospital for attention.
Some five days following the accident, on December 3, 1950, Dr. Charles Lobrano, radiologist, made x-ray pictures of plaintiff’s chest and cervical spine. In connection with these pictures 'Dr. Lobrano testified, as a witness for plaintiff, that he found some arthritic changes in the cervical vertebra and a narrowing of the joint spáce between the fourth and fifth cervical vertebrae. However, the doctor concluded that these .were of long standing and had no connection with the accident which is the basis of this suit.
Dr. J. E. Walsworth,- on behalf of plaintiff, testified that he made his first examination on April 6, 1951, which was the day following plaintiff’s discharge by his attending physician. The witness also made several subsequent examinations of plaintiff but it is not shown that he prescribed any treatment of any nature. Dr. Wals-worth was of the opinion that plaintiff suffered disability as the direct result of the accidental injury which is the basis of this suit. In this connection he seems to have been influenced, to some degree at least,- by the history as given by plaintiff in connection with the accident and his description of symptoms and general complaints. The doctor found no objective symptoms which might explain plaintiff’s complaint save and except the one.which we have noted above that he -considered to be a thickening of the scalp, indicative in his opinion of a low-grade osteomyelitis. In this connection we may say here that this finding stands alone and is specifically disputed by other medical witnesses, both on behalf of plaintiff and defendant, who are of the opinion that the condition of the scalp in the parietal region was the result of chemical burns sustained by plaintiff many years before the accident here under consideration. It is noted that this witness was under the impression that he had examined x-rays of plaintiff’s skull, but on cross examination it was definitely established that he was in error in this connection as the only x-rays to which he had access were those made by Dr. Lobrano, none of which were skull x-rays. The witness to a considerable extent predicated his conclusion of disability on the condition which he observed with reference to plaintiff’s cervical 'vertebra. It was his contention that the pain, headaches and general disability suffered by plaintiff could have resulted from a temporary dislocation of certain of the cervical vertebra caused by the force of the blow sustained in the accident. This theory is not substantiated by other medical witnesses who appeared in the case ■and, on the contrary, the vast preponderance of medical testimony militates against this theory and the conclusion resulting therefrom.
Finally, Dr. Irving J. Wolff, who made examinations of plaintiff on December 5th, 8th and 28th, 1951, and January 15, 1952, testified on behalf of plaintiff. As the result of these examinations Dr. Wolff was of the opinion that plaintiff was totally disabled and he concluded that the disability was connected with the accident suffered by plaintiff in November, 1950. Unquestionably the testimony of this witness and the conclusions reached were influenced considerably by the fact that on two occasions during examination by the witness plaintiff “blacked out” and the witness considered this to be forceful evidence of some sort of brain injury.
Summing up the conclusions and the effect of the testimony of the medical experts tendered on behalf of plaintiff, we find that the testimony of Drs. Foster and Lobrano has little if any bearing or effect upon the issue. It is noted that neither Dr. Wals-worth nor Dr. Wolff had the benefit of the *134 examination of x-rays of plaintiff’s skull, and based their findings and conclusions completely upon the result of their physical examinations.
On behalf of defendant the record discloses the testimony of the late Dr. John G. Snellings, who made a complete physical and • neurological examination of plaintiff on September 1, 1951. After giving a thorough recapitulation of his examination this witness expressed the opinion that plaintiff was fully recovered from any effects of the accident sustained on November 28, 1950, and that he found no objective sign nor ascertained any physical findings which would indicate disability or substantiate plaintiff’s complaints of pain in the head and neck.
We are particularly impressed with the testimony of Dr. J. W. Cummings because it is obvious that this witness had the best opportunity for thorough, complete and continuous observation of plaintiff and his condition over a period of more than four months. Immediately following the accident plaintiff was taken to Dr. Cummings’ office where he was examined before being hospitalized in the St. Francis Sanitarium. At the time of his first examination Dr. Cummings made four x-ray pictures of plaintiff’s skull and subsequently he made four additional x-rays of plaintiff’s skull on January 8, 1951. During the period of plaintiff’s hospitalization from November 28th to December 11, 1950, this witness visited plaintiff twice a day. After being released from the hospital, plaintiff made three visits to Dr. Cummings’ office in the latter part of December, 1950. Thereafter plaintiff was treated in this doctor’s office nineteen times during the month of January, 1951, nineteen times during the month of February, twenty-five times during the month of March, and four times in the early part of April, immediately preceding his discharge on April 5, 1951. We point out some of the significant features of Dr. Cummings’ testimony, namely that when plaintiff was first brought to the witness’ office on November 28, 1950, he complained only of a soreness on the side of his head and gave the history of headaches prior to that time, of wearing glasses, of having pains in the chest. It- was on this occasion that plaintiff informed Dr. Cummings that he had not suffered any nausea, had been only' momentarily dazed, and it was from this first examination that Dr. Cummings made the findings to which we have called attention in the early part of this opinion. As we have noted, Dr. Cummings hospitalized the plaintiff primarily because of the fact that he thought this was good practice in view of his history of having received a blow on the head. During the period of hospitalization the doctor testified that plaintiff did not evidence any real symptoms of injury and aside from complaints with respect to pain in his head he showed no evidence of any ill effects. The doctor testified that the pain was easily relieved by the administration of sedatives and that at the time of his discharge from the hospital plaintiff still showed no indications of having received any serious injury. After his release from the hospital Dr. Cummings treated the plaintiff, as above noted, over a period of more than four months. The witness stated that these treatments were primarily designed to convince plaintiff that he was not suffering from any injury and that he had completely recovered from the effects of the accident. For the most part the treatment consisted of the simple administration of heat to the head and neck. After some weeks of examination and treatment Dr. Cummings insisted that plaintiff be referred to a neurological specialist and in accordance with this recommendation plaintiff was sent by his employer’s insurer to New Orleans for examination by Dr. Howard H. Karr, whose findings are hereinafter considered. In connection with Dr. Cummings’ diagnostic studies he performed a spinal puncture and found the result of this operation negative inasmuch as it showed no increase in cells and no blood. In this connection we call attention to the testimony of Dr. Wolff who stated in the course of cross-examination that a brain laceration would probably be evidenced by the presence of blood in the spinal fluid. It therefore appears that the puncture performed by Dr. Cummings failing to show the presence of any blood in the spinal fluid should be accepted as an indication of the fact that there was no lacera *135 tion or injury to the brain resulting from the accident sustained by plaintiff.
The testimony of Dr. Karr, the New Orleans neurological specialist, who made an examination of plaintiff on March 19, 1951, is given by deposition. The witness testified as to the comprehensive physical and neurological examination, his opinions based upon these examinations and his study of skull x-rays which he made of plaintiff. The witness failed to find even the slightest obj ective symptom which in his opinion would serve to relate plaintiff’s complaints to the effects of the accident of November 28th, and as a consequence expressed the opinion that' plaintiff suffered no lasting effects as the result of the accident, and in the opinion of the witness had not sustained any disability therefrom.
In attempting to evaluate the relative validity and weight of the testimony of the medical experts on behalf of plaintiff and defendants respectively, we. are impressed with the fact that the testimony of . Dr. Cummings should be accorded the greatest validity and weight because of his superior opportunities for observation and because of his continuous close contact with plaintiff over a period of several months. Additionally, we observe that the medical witnesses tendered on behalf of defendants, with the exception of Dr. Snellings, availed themselves of the opportunity to study x-rays of plaintiff’s skull, which was not done by either of plaintiff’s principal medical witnesses. Conceding that skull x-rays in this instance would not be conclusive with respect to final determination of injury, it must be admitted that they are nonetheless of a considerable value in the making of a diagnosis and the forming of an opinion.
It must be borne in mind in connection with the solution of the question here presented that plaintiff labors under a two-fold burden. First, he is required to establish with reasonable certainty his disability, and, second, it is requisite that he relate such disability, if and as established, to thé accident and the resulting injury suffered in the ' course of his employment. Even conceding in this case that plaintiff has succeeded in bearing the burden of establishing disability to do manual labor, it is nonetheless further incumbent upon him to establish a causal connection between the accidental injury of November 28, 1950 and his present disability.
On the basis of our careful study an'd our appreciation of the effect of the medical testimony, we are strongly of the opinion not only that plaintiff has failed to establish causal connection between the accident and his disability, which is essential to recovery, but on the contrary that the medical testimony definitely preponderates against such a contention.
However, we are so keenly aware and so deeply sensible of our obligation of deference to the findings of our distinguished brother of the district court on questions of fact, that we are hesitant to predicate our conclusions and our ultimate opinion solely upon an evaluation of the -medical testimony. As a consequence we have given serious and careful study to- the testimony of the lay witnesses, seeking to find what bearing and what .effect should be given with relation to the medical testimony, and we proceed therefore to a discussion of those pertinent facts which we have gathered as the result of a laborious and painstaking examination of this testimony.
It occurs to us that there are three physical factors, conditions or evidences of injury which bear strongly upon the relation which may or may not exist between the accident and the disability from which plaintiff claims to suffer. These factors are involved with (a) the period of unconsciousness immediately following the accident; (b) the bleeding from plaintiff’s nose and ears; and (c) the blackouts from which plaintiff claims to suffer. We proceed to a discussion of these three items in the order set forth as reflected in the testimony of lay witnesses.
The only witnesses to the actual accident were plaintiff and two of his fellow employees. Plaintiff did not testify that he was rendered unconscious by the blow he received and the only reference which we find in his testimony to the immediate effect of the blow is in his answer, to the question of his counsel on direct examination as to *136 whether he worked any more on the day of the accident after receiving the blow. To this plaintiff answered:
“No, sir. I wasn’t able to work any more because it knocked me out and they brought me to the hospital.”
On being taken to Dr. Cummings’ office it is significant to note that the doctor testified that plaintiff told him that he was probr ably momentarily dazed by the blow he received. , .
One of plaintiff’s fellow workers, who was holding or rather assisting in supporting the air hammer at the time of the accident, testified that the hose came unscrewed and hit plaintiff across the head, and that ■he, the witness, caught-plaintiff “to keep him from, falling over in' the ditch there * * This witness further testified that “Well, when -the other boy came, we pulled him up on the bank and carried on down and turned him over to the foreman.”
This witness did not testify that plaintiff was knocked unconscious.
Another fellow worker, Ernest Jenkins-, testified to the circumstances immediately surrounding the accident, as follows:
“2. I say, what did the hose do to him ? A. -Oh it hit him in the head. ■
“Q, Well, did it knock him down or not? A. It knocked him out, down on the ditch.
“Q. What happened then? What did they do with him? A. Well, they took him on to tire office and give him to the foreman and the foreman took him on to the doctor.”
On the second item as above set forth, bleeding from nose and ears, we find the only testimony to be that of plaintiff and his wife. Plaintiff testified that at the time or immediately following the accident “my ear would bleed continuously and pain me night and day * * Later on in his testimony we note the following:
“Q.. Now right after the — right at the accident you said something about you bleeding. Where did you bleed from? A. Bleed from my nose and my ears.
“Q. How much did.you do that? A. Well I done a whole lot of it for a while, and then it stopped, and then it continue on from then on. I would wake up and. my pillow would be full of blood coming out of my ears and nose.”
On cross examination plaintiff testified as follows:
“Q. Did Dr. Cummings ever see you Weed from the nose and ears ? A. Yes, sir, I told him—
“Q. I asked you did he ever see you bleed from the nose and ears ? A. No, sir.
“Q. Never did? A. Because it was at home and in the hospital, and I told him about it when he come over to the hospital. Well, he said there wasn’t nothing he could do about that. I would have to go to some other specialist to pick up on that. He couldn’t do nothing with that. That’s what he told me at the hospital.”
This- was squarely controverted by Dr. Cummings, who testified on direct examination as follows:
“Q. - Doctor, did he ever complain to you about bleeding through the nose and the ears? A. No, sir.
“Q. Never did? A. He told me one time, that he woke up one night bleeding from his nose.
“Q. Did you examine him? A. Yes, sir. I saw no evidence of bleeding. He could have bled — nosebleed, and be cleared up.”
And on cross examination the doctor testified as follows:
“Q. Did I understand you to say that this man reported as having bled from the ears to you but that you didn’t find any evidence of it, is that right? A. No, sir, you did not. At one time this man complained to me that the night before his nose had bled, but at the time that I saw him, that was after he was out of the hospital, at that time he was not bleeding from the nose and had no- evidence of bleeding, which *137 does not mean that his nose could not have bled the night before. That was several weeks following the injury.”
On this point plaintiff's wife testified on direct examination as follows:
“Q. What if anything did you see of him bleeding? A. Yes, sir.
“Q. ■ How did he bleed? From where? A. From his nose and from his ears.”
And on cross-examination:
“Q. Now you stated a few moments ago that he bled from the nose and ears while at the hospital. A. At home.
“Q. Didn’t do it at the hospital? A. No, sir, it was at home.
“Q. Anybody see him bleed from the nose and ears besides you? A. No, because nobody stays in my house but me at night and him.
“Q. How many times did he bleed from the nose and ears ? A. He bled from his nose and ears twice.
“Q. When was that? A. That was at night. It was about a month or two after they brought him from the hospital.
“Q. In other words he bled twice from the nose and ears? A. Yes, sir.
“Q. About a month after they brought him from the hospital? A. Yes, sir.
“Q. And only two times? A. Yes, sir.”
With reference to the blackout or falling out spells, plaintiff testified, very generally, that he had suffered some of these spells but specifically testified only to two instances. The first of these occasions took place in September of 1951 when plaintiff was picking cotton: His testimony as to this incident is substantiated by some of his companions who were also engaged in cotton picking at the same time and place. The second blacking out incident took place on Thanksgiving day of 1951 and it was on this occasion that Dr. Foster was called to attend plaintiff. Plaintiff himself testified that on this occasion his spell “didn’t last no time”.
The testimony of plaintiff’s wife also contains reference to the blackout spell suffered by plaintiff on Thanksgiving day, 1951, but her testimony differs from that of plaintiff in that she testified that plaintiff was still out when he reached the Charity Hospital. This appears to be positively contradicted both by the. testimony of the plaintiff and that of Dr. Foster.
The only other blackout spells of which there is any evidence in the record are the two occasions in Dr. Wolff’s office above noted in our comments with respect'to the testimony of this medical witness. Strangely enough plaintiff was not questioned himself as to those two particular occasions.
We can only conclude that despite the references to what are made to appear as frequent blackout or falling out spells there are only four specific and definite instances of such seizures, all of which, quite frankly» appear to be open to some question or doubt. It is further worthy of note that the first of these spells if the testimony with reference to these specific instances be accepted, occurred in September of 1951,- that is, something more than ten months after the accident which is the basis of this suit. The other spells took place respectively in November and December of 1951 and January of 1952.
In the light of the testimony above set forth bearing upon these three phases in connection with plaintiff’s injury, we are constrained to observe that plaintiff was not rendered unconscious by the blow he received unless it may be concluded that the expression “knocked out” meant that he was temporarily dazed for a very brief period of time. This conclusion does not at all accord with some of the representations made by plaintiff and the history given-by him on various and sundry occasions to members of the medical profession by whom he was under examination.
Similarly we find it beyond belief to credit plaintiff’s direct testimony with reference to his frequent serious spells of bleeding from the nose and ears. In the first place, we do not believe that any of these spells could have occurred while plaintiff was in the hospital as he claims *138 without being called to the attention of his attending physician, Dr. Cummings. Nor do we believe that plaintiff; as sensitive of symptoms and pains and conditions in connection with his alleged injury as he appears to be, would have failed to call Dr. Cummings’ attention' to his recurrent spells of bleeding from the nose and ears which he professes to have suffered after being discharged and returning to his home.
Finally, we are not impressed with the relationship between the isolated instances of blacking out,- even if full credence be given to the testimony which attempts to establish-them as facts, with the effects of the accident which occurred almost a year before the first of such incidents.
■Careful study of the testimony given by plaintiff himself has revealed so many inconsistencies, discrepancies and patent misstatements that we are regretfully forced to conclude that his testimony in the main is unworthy of belief. In substantiation of this conclusion we point out a few, and only a few, of the false or misleading state-' ments which are obvious. Plaintiff testified that he was in the'hospital around a month and something days, when, as a matter of fact, he was hospitalized for a period of only thirteen days; that while in the hospital he would not even 'be allowed to talk “in a week” to keep him from “taking a hemorrhage”, which is clearly untrue in view of Dr. Cummings’ testimony that the hospital records indicated that plaintiff was, getting an average amount of rest, eating well and functioning normally; that Dr. Cummings told him that he had to discharge him from treatment although he wasn’t well, which is squar.ely and positively contradicted in the testimony ' of Dr. Cummings; that Dr. Cummings didn’t know that plaintiff had been sent to New Orleans for examination by Dr. Karr, when Dr. Cummings testified not only that he had recommended this examination by Dr. Karr, but quoted from a letter which he had written insisting upon this action being taken, and further testified that he knew of plaintiff’s trip to New Orleans and received a written report from Dr. Karr with reference to his examination.
We think the complete unreliability of plaintiff’s testimony is further supported by the inconsistent and divergent versions of the history of the accident and its effects which plaintiff gave to the several medical practitioners who made examinations. In this connection we further call attention to the patently untrue testimony of plainiff that he did not tell either Dr. Cummings or Dr. Snellings anything about his accident and injury — in other words, that he did- not give them any history as to the injury.
In view of the reasons set forth we are of the opinion that plaintiff has woefully failed to sustain the burden of proof by establishing a causal connection between the accident which occurred in the course of his employment and his alleged permanent disability.
It appears that there is some misunderstanding with reference to the date of the actual discharge of plaintiff from treatment by Dr. Cummings. We think this date has been established by the testimony of the-doctor‘himself beyond any question as being April 5, 1951, and it further appears that compensation was paid only to date of Marchó, 1951. Despite Dr. Cummings’ testimony to the.effect that in his opinion plaintiff had long since recovered, we consider that since he was held under medical treatment and was not formally discharged until April 5th as being fit and able to return to work, he is entitled to compensation up to such date.
Accordingly the judgment from which appealed is amended to the extent of awarding compensation in favor of plaintiff at the rate of $24.70 per week from December 5, 1950, to April 5, 1951, inclusive, subject to credits for amounts heretofore paid, and as amended to that extent the judgment is affirmed. In all other respects the judgment is reversed and set aside and plaintiff’s further demands are rejected, all at appellant’s cost.